**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLICATION OF SHERVIN PISHEVAR FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. _____ |

**DECLARATION OF CHARLOTTE WATSON**

I, Charlotte Louise Hay Watson, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.      I submit this declaration in support of Mr. Shervin Pishevar ("Petitioner")'s *Ex Parte* Application and Petition For An Order to Conduct Discovery For Use In Foreign Proceedings Pursuant To 28 U.S.C. § 1782 (the "1782 Application").

2.      Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents, including the proposed subpoena; and (c) information supplied to me by Petitioner or professionals retained by Petitioner.

**QUALIFICATIONS**

3.      I am Senior Legal Adviser at Schillings International LLP.  I am licensed to practice law in England and Wales. I graduated with an M.A. (Hons) from Edinburgh University, and completed the Common Professional Examination in Law and the Law Society Finals at The College of Law, Lancaster Gate, London.

4.      From 1989 to 2002 I worked for a specialist libel and media law practice where I was a Partner from 1990.

3197189_10

5.　　Between 2006 and 2014 I worked as an in-house Counsel advising on media law for a number of newspaper organizations including Associated Newspapers Ltd (The Daily Mail, Mail Online and Metro) and Independent Print Limited (The Independent, the i and the Evening Standard).

6.　　I therefore have extensive experience of acting for both Claimants and Defendants in media law matters.

7.　　I attached my Curriculum Vitae as **Exhibit 1**.

**FACTUAL BACKGROUND**

8.　　In addition to the details set out below I refer to the Declaration of Lord Macdonald of River Glaven KT QC dated July 19, 2019 ("Lord Macdonald's Declaration") also made in support of the 1782 Application, in particular to the Factual Background included therein.

9.　　The Petitioner is an Iranian-American entrepreneur, venture capitalist and angel investor.  The Petitioner is a US citizen and frequently travels to the United Kingdom for business.

10.　　On May 26, 2017, the Petitioner had consensual sexual intercourse at a hotel in London.

11.　　Later that day, the Petitioner was woken by police officers in his hotel room and arrested by City of London Police ("COLP") on suspicion of sexual assault. The arrest was a total shock to the Petitioner, who was understandably distressed and traumatized by it.  There was no substance to the claim whatsoever.

12.　　On May 28, 2017, the Petitioner was released from custody under police bail (which meant that he had not been charged with any offence and was free to leave the police station) to return to the police station on June 23, 2017.  On June 19, 2017, however, the Petitioner was released from

3197189_10

police bail but remained under investigation until July 28, 2017, when COLP confirmed to the Petitioner that they would be taking no further action against him due to insufficient evidence.

13.    After he received enquiries into the arrest by a journalist for a UK newspaper, the Sun, the Petitioner instructed our firm to represent him.  On June 21, 2017, our firm obtained an injunction preventing the Sun from naming or identifying the Petitioner in relation to the arrest in any future publications (the "Injunction").  The Injunction was granted on the basis that if the Sun published an article speculating about the Petitioner's arrest it would have been a gross invasion of his privacy rights as protected by Article 8 of the Human Rights Act 1998.

14.    On August 1, 2017, COLP released a press statement which stated: "*Following an investigation into a report of a rape at a location on Poultry, EC2 [London] on Saturday 27 May 2017, we can confirm that no further action will be taken. A 43-year-old man from San Francisco was initially arrested on suspicion of rape before being released under investigation*".  The Petitioner was not named and as per the press statement on August 1, 2017, COLP announced the investigation had ended.  A true and correct copy of the COLP's press statement is attached hereto as **Exhibit 2**.

15.    On October 13, 2017, Marcus Baram of Fast Company Magazine, a US publication, contacted the COLP press team to enquire further about the arrest on May 27, 2017.  COLP responded to say that the investigation into the arrest was no longer ongoing and as such no further action would be taken.  On October 15, 2017, Mr. Baram contacted COLP again to ask whether they would confirm it was the Petitioner that was arrested.  The following day COLP responded to say that, as per COLP policy, they could neither confirm nor deny any name put to them in connection with an arrest.  At the same time they also confirmed that the investigation was not being reviewed and would not be reopened.

3

3197189_10

16.     On October 18, 2017, Mr. Baram then emailed COLP attaching a copy of a police report that he had obtained which named the Petitioner and contained false information (the "Forged Police Report").  Due to the details contained in the Forged Police Report, anyone that read it would wrongly associate Petitioner with disreputable or notorious conduct.  Mr. Baram requested that COLP confirm whether the Forged Police Report was authentic.  Upon receipt of the Forged Police Report, COLP conducted an internal investigation into its authenticity.  In an email dated October 23, 2017, a true and correct copy of which is attached as **Exhibit 3**,  COLP responded to Mr. Baram in an email which stated that following their investigation, due to inaccuracies in the Forged Police Report it led them "*to believe it is false*".

17.     On October 24, 2017, COLP produced a report which stated that it was "*unlikely*" that the Forged Police Report had been created within COLP or leaked by COLP to the media.  Thereafter, on or around  October 24, 2017,  COLP confirmed to Mr. Baram & others that the report was a fake.  In another email in response to Mr. Baram, dated  October 31, 2017,  COLP confirmed that it was not true that the case had been reopened.

18.     On November 6, 2017, the Petitioner filed proceedings in the United States for a defamation action against another party.  In the filed action, the Petitioner, in voluntarily waiving his anonymity, also made reference to the untrue allegations of sexual assault which were being leaked to the media following his arrest.  The Petitioner admitted to the arrest but denied the false allegations of sexual assault.  On November 7, 2017, Mr. Baram then contacted COLP again, and in referring to the US defamation action claim brought by the Petitioner, enquired whether they could provide further details.  COLP again confirmed the case had not been reopened and stated they had no further comment on the matter.

3197189_10

19.     Notwithstanding the fact that COLP stated to them that the Forged Police Report was false, on November 8, 2017, Fast Company published an article entitled "'*Smear Campaign' or not tech investor Shervin Pishevar really was arrested earlier this year*", a true and correct copy of which is attached as **Exhibit 4.**  The article made reference to details contained in the Forged Police Report, including private information about the Petitioner as well as false information about the arrest.  The article was wrongly afforded greater credibility by referring to the details of the Forged Police Report.

20.     The following day, on November 9, 2017, more publications released articles referring to the contents of the Forged Police Report.  The NY Post published an article entitled "*Billionaire ally of ex-Uber CEO busted on rape charge*" which included details from the Forged Police Report stating "*according to a police report obtained by The Post*".  Forbes published an article entitled "*Shervin Pishevar, arrested but never charged over alleged rape, says he's a victim of 'smear campaign'*" which stated "*a copy of the police report obtained by Forbes, confirms the details of the arrest and the identity of the suspect*".

21.     On November 9, 2017, Hickman & Rose, UK criminal counsel for the Petitioner, contacted COLP to enquire whether any private information relating to the Petitioner had been disclosed to the media following the arrest.  On November 10, 2017, they confirmed that no such disclosure had been made and Hickman & Rose responded with a request for a copy of the Forged Police Report.  On November 13, 2017, COLP declined the request due to ongoing enquiries as to the purported commission of any criminal offences related to the Forged Police Report.

22.     On November 10, 2017, following the Petitioner's voluntary waiver of his anonymity, the Court lifted the Injunction.

23.     In an email to COLP dated September 28, 2018, Hickman & Rose renewed their request for a copy of the Forged Police Report as well as confirmation as to the source that provided

5

it to COLP.  In a response dated October 25, 2018, a true and correct copy of which is attached as **Exhibit 5**, COLP's in-house lawyer stated that they "*can confirm that there is no criminal investigation in respect of the document in question. The City of London Police is content for me to inform you that the screenshot of the document was supplied to them by Marcus Baram of Fast Company. The City of London Police is not prepared to provide a copy of the screenshot without a court order requiring disclosure*".

24.     On November 1, 2018, Hickman & Rose made a Subject Access Request to the COLP for the Forged Police Report.  They subsequently made a *Norwich Pharmacal* Application (a type of third-party disclosure application) to the court on April 4, 2019 compelling COLP to disclose the information that had been requested.

25.     COLP consented to the Norwich Pharmacal Order and provided a copy of the Forged Police Report to Hickman & Rose on May 29, 2019.  On June 11, 2019, COLP then provided further documents, detailing their internal investigation into the Forged Police Report's authenticity as well as contact with media following enquiries into the Petitioner's arrest.

26.     COLP confirmed, by way of a witness statement from Detective Sergeant ("DS") Jonathan Witt ("Witt Witness Statement") dated 17 May 2019, that on 24 October 2017 whilst based at the COLP's Professional Standards Directorate he had been informed that an "arrest report" had possibly been leaked to the media.  DS Witt was then provided with a screenshot of the document in question.  DS Witt was then instructed to undertake a scoping exercise into the "arrest report" to determine its authenticity.  DS Witt concluded that the document was "not authentic" and produced

3197189_10

the report referred to at paragraph 17 herein, on October 24 2017 setting out the investigations undertaken and the reasons for his conclusions.[1]

27.    I would also refer to paragraph 17 of Lord Macdonald's Declaration which refers to the witness statement of Theresa La Tangue, Communications Director for COLP dated May 23, 2019 which states that "*the 'arrest report' was sent to the COLP's Professional Standards Directorate who were able to confirm that the document was not a COLP document*" and "*thereafter Marcus Baram was told, along with other journalists who enquired, that it was a fake, explaining that it was not a document that is used by the COLP and that the officer named does not work for the COLP.*"

## THE CONTEMPLATED ENGLISH PROCEEDINGS

28.    As a result of the circumstances described in the above paragraphs, *supra* ¶¶8-27, the Petitioner is contemplating proceedings in England for civil claims including (without limitation) negligent misstatement.

29.    Negligent misstatement is a common law tort in which party A owes a duty of care to Party B and carelessly makes a false statement to Party B on which Party B relies and, consequently, Party B suffers loss.  It is not necessary for the duty to have been created pursuant to a contract.  The Petitioner is contemplating bringing proceedings on the grounds of negligent misstatement given that the author(s) and disseminator(s) of the Forged Police Report owe him a duty of care not to publish private information about him which they knew to be false, which the media (and possibly others) have relied on which has caused him loss ("Contemplated Civil Proceedings").  To this end, the Petitioner has retained our firm in order to advise on and pursue civil claims in the United Kingdom,

---

[1]  As the Witt Witness Statement exhibits the Forged Police Report, I have not attached it to this declaration to prevent further dissemination of the forged document.  However, Petitioner is prepared to submit the Witt Witness Statement and the Forged Police Report for *in camera* review.

3197189_10

including (without limitation) negligent misstatement.  Accordingly, our firm has begun drafting the necessary filings to initiate this claim, including the Claim Form.

30.     Under English civil procedure, a complainant may initiate a civil claim against "Persons Unknown" (similar to John Doe defendants in the United States).

31.     In order to establish whether the tort of negligent misstatement has been committed, the English Courts require the Petitioner to demonstrate there was a duty of care, a breach of that duty and the Petitioner suffered as a result of that breach.

32.     *Caparo v Dickman,* a true and correct copy of which is attached as __**Exhibit 6**__,[2] is the leading case in determining whether a duty of care exists.  The test is three-fold, in which it must be established that:

> a.   it was foreseeable that Persons Unknown's conduct would cause loss to the Petitioner;
>
> b.   there was a sufficient degree of proximity between Persons Unknown (also known as a "special relationship") and
>
> c.   It would be fair, just and reasonable to impose a duty of care in the circumstances.

33.     In the contemplated proceedings, the Petitioner will submit to the English Court that in providing the Forged Police Report to the media, it would have been foreseeable to Persons Unknown that this would cause loss to the Petitioner.

34.     Further, it would have been foreseeable that the media, in their professional capacity of reporting news, would have relied on the Forged Police Report in their publications.  Providing the Forged Police Report, whether carelessly or knowingly as to its falsity, created a sufficient degree of proximity notwithstanding the fact that the negligent misstatement was not made to the Petitioner directly.

---

[2] [1990] UKHL 2.

3197189_10

35.     The Supreme Court of Ireland in *Harold Wildgust and another  v Bank of Ireland and another[3]*,  a true and correct copy of which is attached as **Exhibit 7**,  established that that it was not necessary for the negligent misstatement to be made directly to the plaintiff, provided there was sufficient proximity between the parties.

## THE DISCOVERY SOUGHT BY THE 1782 APPLICATION

36.     I am the Solicitor with day to day management of the Contemplated Civil Proceedings. I consider that the discovery sought from Fast Company will be relevant to the Contemplated Civil Proceedings, including for the reasons summarized below.

37.     The information provided by Respondents, pursuant to the 1782 Application, will be used to identify the Persons Unknown (i.e. the author(s) of the Forged Police Report) in order to adequately conduct the civil proceedings through resolution.  Petitioner will use the identity of the authors of the Forged Police Report to (i) adequately plead that a duty of care has been breached, and (ii) enforce any relief obtained by the court.  Petitioner has no other way to obtain this information other than through the 1782 assistance of the US court.

38.     Petitioner will be able to use and introduce any information obtained pursuant to the 1782 Application at any stage of the English civil proceedings, though it would be preferable to obtain the information prior to filing the Contemplated Civil Proceedings in order to issue proceedings against the actual author(s) of the Forged Police Report rather than "Persons Unknown" (and then have to amend pleadings to substitute Persons Unknown with the name(s) of the report's author(s)).

---

[3] [2006] 2 ILRM 28.

3197189_10

## ENGLISH COURTS ACCEPT EVIDENCE OBTAINED THROUGH SECTION 1782

39.     I am not aware of any reason that the Courts of England and Wales will not be receptive to the judicial assistance requested in the 1782 Application.

40.     In fact, English Courts have declared their willingness to accept evidence obtained through Section 1782 applications.  In *South Carolina Co v Assurantie N V.*, a true and correct copy of which is attached as **Exhibit 8**, the House of Lords rejected a finding by the Court of Appeal that use of information obtained from a 1782 application was inherently objectionable and abusive because it interfered with the court's control of its own procedure.  The House of Lords held that it did not consider that a party to English proceedings, "by seeking to exercise a right potentially available to them under the Federal law of the United States [*i.e.*, seeking discovery through a 1782 application], have in any way departed from, or interfered with, the procedure of the English court."[4] "All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe they need in order to prepared and present their case."[5]

41.     A similar decision was reached in *Nokia Corporation v. Interdigital Technology Corp.* a true and correct copy of which is attached at **Exhibit 9**.  There the Court denied a request to restrain a party from making a 1782 application in the United States and stated that "it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings."[6]  The Court further stated that "the English court should not seek to circumscribe the discretion possessed by the [US] district

---

[4]     *South Carolina Co v Assurantie N V.* [1987] 1 A.C. 24 (HL) at 42.

[5]     *Id.*

[6]     *Nokia Corporation v. Interdigital Technology Corp.* [2004] EWHC 2920 at 8.

3197189_10

court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand.  It is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary after appropriate amendment."[7]

42.     In short, the 1782 Application does not seek to circumvent foreign proof-gathering restrictions or other policies of the Courts of England and Wales, and I believe that there is no basis under English law to assert otherwise.

43.     I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.


Executed on this 19 day of July, 2019 in London, England.


*Charlotte Watson*

Charlotte Watson

---

[7]     *Id.*

3197189_10